Our second and final case this morning is number 13-50-11 Veridyne Corporation v. United States I have some difficulty in understanding exactly what's going on here. Could you help me? As I understand it, three things happened to you. One is that certain claims were forfeited 260-267, the claims that hadn't been paid, right? That's right. And there was an FCA penalty with respect to each of the invoices, including both the paid and the unpaid invoices, right? That's correct. With respect to 265, 266, and 267, is that correct? That's correct. Okay. Is it fair to say that you're not appealing the forfeiture of the invoices 260-267? That's correct. The Court of Federal Claims was correct in concluding that invoices 260-267 should be subject to forfeiture. Unfortunately, the Court of Federal Claims took an additional step and awarded Veridyne a quantum merit recovery on the same claim that covered those invoices. So what you're saying is there shouldn't have been any quantum merit recovery? That's correct. That's the only issue that you appeal? That's right. That's the only issue the government has raised on appeal. And you don't understand the contractor to be challenging the forfeiture as such? That's correct. That's correct. And clearly, the Court of Federal Claims erred in concluding that Veridyne was entitled to quantum merit recovery, notwithstanding its conclusion of forfeiture under the special plea and fraud. Not only is such a conclusion contrary to the language of the statute and the circuit case law, but it also would eviscerate the special plea and fraud. Remarkably, the Court of Federal Claims reached its conclusion without really addressing any of those factors. Did you present those factors to the trial court? The issue wasn't raised before the trial court. I mean, I read the trial court's opinion. There's a lot of talk about quantum merit, right? That's right. And there's a decision to award on 260-265 quantum merit, right? That's right. And 260-261-234 and a bit of five. But I didn't see you advancing the cases that you're advancing now. Because there wasn't a suggestion before the Court of Federal Claims that the government's forfeiture under the special plea and fraud might be subject to a finding of quantum merit. Quantum merit only came up in one other circumstance earlier in this matter, and that was in the court's decision in Veridyne, too. Was the award quantum merit on basically what was the CDA claim? That's correct, in the court's final. And it's for the invoices 260-61-62-63-64, right? That's correct. And maybe a tiny bit of 65? That's right. But there was no suggestion by Veridyne or the court at any earlier stage of the litigation that… These were invoices that had not yet been paid, right? That's correct. And so Veridyne was arguing to the judge below, we should be paid for those. Veridyne never argued that it should be paid on those invoices, notwithstanding a finding of forfeiture under the special plea and fraud. And Veridyne's not arguing that the government waived its argument in this appeal either. But they were arguing that there shouldn't be a forfeiture with respect to those invoices, right? But not on the grounds that they were entitled to recover in quantum merit. No, no, I understand. But they said there should be no forfeiture. But as I understand their brief, they're not raising that on appeal, right? That's right. That's right. So with respect to the forfeiture, the only issue that's been raised on appeal is the quantum merit issue. It seems to me that… I'm sorry. Go ahead, Al. Do you understand that the cross appeal only to reach the false claim act issue on the mod 23? And also, I think Veridyne raised an issue with respect to the government's CDA recovery. They're challenging the $568,000 under the CDA. Right. I think on the grounds that there's insufficient evidence of Veridyne's intent to defraud. On the fraud. Which is interesting because Veridyne has not challenged… which is interesting because Veridyne has not challenged the court's finding with respect to the forfeiture of invoices 260 through 267, which necessarily would have included a finding of intent to defraud by clear and convincing evidence. So to rate that issue in the context of the CDA claim, but not with respect to the forfeiture as a result of fraudulent invoices seems to be inconsistent. And your bottom line argument is that we should reverse on the appeal with regard to the award of equine marijuana and we should affirm on the cross appeals. That's right, Your Honor. That's what you're telling us. It seems to me that the court below is disturbed as a policy matter. And what the judge is disturbed about is that it appears that one government entity conspired with a contractor to defraud another government entity. And that when the contractor says, hey, this was all done with the knowledge and permission of the government, to the extent that they're talking about the maritime administration, it appears to be true. Do you contest the truth of that overall statement that the maritime folks knew what they were doing was an attempt to avoid the SBA rigs? We don't dispute that MARAD personnel were fully aware of the attempt to circumvent the SBA sole source threshold. And it looks to me like what the CFC is doing in an internally contradictory way is trying to get some sort of resolution which deals with that unique circumstance where the fraud expands to include part of the government. I think that's right, Your Honor. And ultimately, the conclusion the Court of Federal Claims reached is, in short, the fact that there may have been bad actors within MARAD doesn't absolve Baradine from having been a bad actor. But actually the contractor was with the SBA and not with MARAD, right? It was a tripartite contract, so it was signed by both MARAD and the Small Business Administration. I thought that the Court of Federal Claims said it was actually a contract with the SBA, but that doesn't perhaps make a difference. That's correct. As a technical matter, the SBA is the prime contractor and Baradine was the subcontractor under the contract. The fraud here with respect to the contract was in the proposal, right? That's right. The Court of Federal Claims found that Baradine's Mod 23 proposal was false and fraudulent and led to the award of Mod 23. What does the record show about whether that proposal was sent to the SBA? The record's not clear as to whether it was sent to the SBA, but the record is clear that Baradine was told that it was going to be sent to the SBA. By the proposal, do you mean everything, all of the cost estimates, the whole package? That's right, exactly. When Baradine described this as a hypothetical scenario, this wasn't a two-page Microsoft Word document in which they laid out some thoughts about how they might construct the contract. This was a roughly 75-page proposal document that included FAR certifications, Truth in Negotiation Act certifications. This was addressed up as a contract proposal and clearly was designed to fool somebody, SBA in particular, into thinking that this was a bona fide proposal. Well, suppose we were to conclude, just hypothetically, that we had to find that there was fraud with respect to the SBA as opposed to Merritt, since Merritt was aware of what was going on. I know you don't agree with that, but let's just assume that hypothetically. Can the judgment be sustained here with respect to the SBA penalties on the ground that the Small Business Administration was defrauded because the proposal was prepared with an eye to sending it to them? Would that be sufficient? I'm happy to answer Your Honor's question with reference to the SBA. I do want to be clear, though, that finding a fraud isn't necessary here. This is the False Claims Act, which has a lower CANDOR standard, and the standards for finding liability under the SCA differ from those for fraud. But that said, yes, the Court could conclude, in fact, could conclude based explicitly on the findings of the Court of Federal Claims. The Court of Federal Claims found that Veridign was aware that SBA had to approve this contract, that it was aware or had been informed that its proposal was going to be submitted to SBA for approval, and also found that there was no evidence that SBA actually knew what was going on. So to the extent that Veridign is relying on government knowledge or a government knowledge defense, it can't do so with respect to what it might have believed that SBA knew. The SCA required that the document be actually submitted to the agency? In other words, it couldn't get an SCA penalty, could you, if you prepared a false fraudulent contract but never submitted it to the government, right? Well, in this case, it was submitted to the government. It was submitted to MERAD is the problem. The record doesn't seem to say it was submitted to the SBA. Well, it was submitted to MERAD with the intention that it would be passed to the SBA. Is that off the record? That isn't the record, and it's part of the... That's in the record? It is, and it's part of the Court of Federal Claims. I mean, would SBA necessarily have known from looking at the package that this was an attempt to get around the SBA's requirements as to the size of the contract? No, there was nothing in space of the document. Well, I mean, the fraud is that. I mean, the misleading, the thing that causes the liability under the False Claims Act was the fact that they were trying to end-run SBA's requirements as to the size of the contract, right? That certainly would demonstrate... I mean, if you ask, what is the sin that MERAD committed, or what was the sin that was being committed between MERAD and Colinas and MERAD? It wasn't to get this contract approved by SBA, which they wouldn't have been able to get it approved if they had in realistic numbers, right? Well, it certainly renders their conduct more sinful, but even if SBA hadn't been involved... What I was getting at is... Of course, the dealing between... Something was, the Chief Judge asked, the Presiding Judge said, was it communicated to SBA? And you said, yes, the contract package went. No, I don't think he said that. I think you said that it was intended that that would happen.  It didn't happen. Right. Veridon had been informed that it would go to SBA. So at the time Veridon submitted its proposal, it knew that that package was going to be material to government consideration. I thought the reason why we're talking about this is because there is some case law out there in the other circuits that says the cyanide that's required in Veridon's mind can be vitiated by government knowledge of what's going on. Is that what we're talking about? It can under some circumstances. Is that why we're talking about this subject matter? Well, I think we're talking about this subject matter because if MERAD were the only contracting party, those cases would be implicated. I guess what I was asking was whether that whole issue could be avoided because the SBA was the technically contracting party, and there's a specific finding by the Court of Federal Claims that the Small Business Administration was not aware of the fraud or the falsity. There is. There is a specific finding by the Court of Federal Claims that SBA was not aware of the certain measure of fraud. Pardon your honor? I thought that was really one of the bases of a ruling. That was part, and in particular part of the knowledge. A ruling that absolves a plaintiff of FCA liability because SBA did not have knowledge would be pernicious and is rejected. That's right. But the problem that I'm having there is that it seems to me that in order to sustain this on the ground that there was a false representation to the Small Business Administration, you'd have to find that they actually got the document, and the problem is the record doesn't show they actually got the document. Well, not necessarily, your honor. We perspectively disagree. There's the materiality standard. To tie this back to the elements of the FCA, the materiality standard is not an outcome materiality standard. It's a prospective or claim materiality standard, and this is, I think, most effectively laid out. Sure, but the claim would have to be made to the government to result in FCA liability. We just took Marriott out of this. We ignored Marriott entirely. It seems to me that the predicate for an FCA penalty based on submissions to Marriott don't exist because the false document, that is, the proposal, has not been shown to have been submitted to the SBA. Fair or not? I mean, I agree that the document hasn't been shown to have been submitted to the SBA. It seems to me, then, that we have to sustain this on the ground that it was submitted to Marriott, and that it nonetheless invokes FCA liability, even though Marriott was aware that it was a pony. Right? I'm sorry, I didn't follow your honor's question. I'd say, since the document wasn't, the record doesn't show that the document was submitted to the Small Business Administration, that if we're going to sustain the FCA penalties, we have to sustain it on the ground that there was a false document submitted to Marriott itself, rather than to the SBA. I don't think that's necessarily the case, your honor. Because, again, what it depends on, what the FCA analysis depends on, is just the materiality of the false statement itself. Not whether it's actually communicated or actually has an impact on the ultimate decision. It has to be communicated, doesn't it? Not necessarily. No? No, it does not. There is no outcome materiality. It simply has to be capable of influencing. Are you talking about the same thing? We're still talking about exoneration, aren't we? Yeah. In a situation where you're saying, well, the government knew all about it, and therefore, under case law in the open circuits, depending on the circumstances, we won't tax the contractor with his admitted wrongdoing. Because it's sort of like the government is involved in it. And so I think what the presiding judge is saying, in this particular case, there's an absence of any evidence in the record that the SBA knew what was going on. That's correct. That being the case, that there is, the only knowledge we have here, right, is on behalf of Marriott. But the contracting party was SBA. There was no submission of a document to SBA, as opposed to Marriott, that invokes the FCA penalty. Right? I mean, let's say hypothetically, there's a contractor, there's a government agency. Government agency is X. Okay? If you prepare a false claim, and you plan to submit it to the agency, but you never do, there's no FCA penalty, right? No, but if you actually submit it with the intention of submitting a false report, with knowledge that the claim is false, then that is sufficient for a False Claims Act violation. Regardless of whether or not the SBA dealt with that. The only evidence in this case is that that took place with respect to Marriott, but not with respect to SBA. Right? The proposal was not submitted directly to SBA. Now, I do want to make clear, though, although the proposal itself was not submitted to SBA, the numbers from the proposal, the figures that Veridine generated, were used in a memo from the Maritime Administration to SBA. Those, the overall spending figures that ultimately led to the $2.9 million amount for the contract extension, those numbers were used in a justification memo that was sent from Marriott to SBA. The figure that was just short of $3 million, that number that had been generated by Veridine was used in Mod 23 itself, and ultimately SBA signed a contract extension that used those numbers. Why 127 quacks instead of one? The bad behavior here was in submitting a proposal for Mod 23 that was tainted. Right? Right. But the case law is pretty clear, Your Honor, that if a contractor fraudulently obtains a contract, then each invoice submitted under that contract is itself false. What's your best case for that proposition? U.S. Ex-Royal Marcus V. Hess, the Supreme Court case. And there are a number of certain cases that have held precisely the same thing. So, I see that I've gone over my time, so I'll yield the podium. Well, we'll give you a couple minutes for rebuttal. Thank you, Your Honor. Mr. Lammer, is it? Yes, I think I've been in front of you before. Uh-huh. So, you're not appealing the forfeiture here, right? It's, um, she says she rendered a forfeiture, but apparently it's unclear as to what she did. The lower court, the CFC, said that the defendant has established its forfeiture, but I'm awarding Veradyne the amount of the invoices, 260 to 264, up to the amount of money that was available under the contract. In fact, she said that the contract was not void because the extension had not been procured by fraud. I thought the amount of the quantum merit recovery was substantially less than the amount of the invoices, right? She awarded the amount of the invoices up to the level of funding, but based on, because funding was applied based on work orders. She took each work order, and when the level of funding was exhausted on that work order, that was all that was awarded on the invoices relative to that work order. But it seems to me that she said that the pending claims, 260 to 267, were forfeited under the special plea and fraud, and then allowed you quantum merit recovery. And the government is appealing from the quantum merit recovery. You're saying the quantum merit recovery was appropriate, but I don't see you arguing in your brief that the forfeiture was improper. We didn't argue that the forfeiture was improper because the net result of what she did was to award the money under the invoices. So if the government wins on the quantum merit point, you lose on the forfeiture, right? If the government were to win on the quantum merit point, we would lose on the forfeiture. Right. So apart from the quantum merit issue, then we have to focus on the FCA penalties and the CDA penalties. Correct. And I wanted to address the FCA penalties. Number one is, and your honors brought it up, is the government knowledge issue. There's nothing in the record that indicates that Veridyn communicated with SBA. No, but it gave a document to Marad with the expectation that it would be given to the SBA. I'm not so clear. It's not clear that the expectation was that that document would be given to SBA. It is clear that the expectation was that Marad would go to SBA, because they had to, to get the approval. And there's no question that Marad did, and there's no question that Marad represented the SBA. Marad drafted Modification 23. Marad represented the SBA. But Marad took your numbers that were in the proposal and transmitted those to SBA to get the approval, right? Correct. But Marad knew well that those were not numbers that were meant to estimate what Marad's needs were going to be. They knew it from day one. But SBA didn't know. SBA didn't know, and Veridyn didn't communicate to SBA. Veridyn gave Marad a proposal. Well, but it didn't communicate to SBA through Marad, did it not? I would not agree that Veridyn, Veridyn did not seek to communicate with SBA. Veridyn gave a document to Marad. Veridyn seeked to obtain SBA money? No, they sought to obtain Marad money. None of the money here came from SBA. SBA, under the program, SBA signs off and then drops out. For all practical purposes... What's the source of the money? Marad. Absolutely, Marad. Because Marad had to place the funding on the contract. Remember, the record shows we went through all these gyrations of putting money on the contract with Marad money. The SBA role is so that you don't have to have competitive bidding, right? Correct. SBA decides whether or not... The original contract was not competitively awarded. SBA had given a waiver and it was however many millions of dollars were projected when it was awarded. SBA was essential to the contract. It was essential to get the... They had to sign off on the modification. It couldn't happen without SBA saying it's okay. And SBA can't possibly sign off if it's okay if the contract's worth more than $3 million. Correct. And Marad represented SBA. And the misdeed was in making a proposal that both Marad and your client knew was going to be greater than $3 million. Well, Marad certainly knew. My client certainly hoped that it was going to be greater than $3 million. And Marad would do whatever they had to do to get the approval to give whatever amount of business they sought to give. I mean, he wanted to stay on the contract. There's no question about that. So the quantum merit doctrine is an equitable doctrine, is it not? Yeah, I would say quantum merit is an equitable doctrine. And equity is barred by... Based on a contract in law, you've implied in fact contract, right? Well, I'm not sure the court made a finding that there was an implied in fact contract here. It can't be relieved otherwise. Pardon? The court that can't be implied in law contract won't apply in the court of federal counsel. That's correct. The court has no jurisdiction over an implied in law contract. It's also worth mentioning that in this instance... Stay with me. Pardon? Stay with me. Oh, I'm sorry. Okay. So equity bars recovery by a party which has unclean hands, does it not? It does. There we go. But if there are unclean hands, what we have is here the contractor being penalized for 127 invoices at $11,000 apiece to create a windfall for Marriott, effectively. Marriott gets the services for free and we get a penalty. That happens in every forfeiture, doesn't it? Pardon? That happens in every forfeiture, doesn't it? Well, I'm not sure it happens in every forfeiture because there are some cases where there have been forfeitures. There have been false claims act penalties where the contractor was still awarded some amount of money and that was the Miller case that we cited where the court seemed to say, okay, five... No, but we're talking here about special plea and fraud. When there's a forfeiture under the special plea and fraud, the question is whether you can get Quantum Marriott recovered, right? In your Amdahl case and these other cases which it cites don't address the special plea and fraud. No, they don't. And it is true, is it not, that in every case where there's a special plea and fraud, based on invoices, the contractor is invoicing for work that was done. So the Quantum Marriott issue would arise in virtually every case involving a special plea and fraud, correct? Correct. And there's not a single case which before has ever allowed Quantum Marriott recovery where there's been a special plea and fraud, correct? The only case from this court that we had was Amdahl and it's not quite the same situation because it's not a special plea and fraud. So slide back with me to where you're saying that the unclean hands belong to Marriott, but a conspiracy is an agreement between two or more persons to commit an unlawful act or a lawful act in an unlawful fashion, right? There's a bar review statement. Yeah, I can't disagree with that. You've got to have two people for a conspiracy. Two persons, not people. Two entities, whatever. So when that happens, the unclean hands of one conspirator become the unclean hands of the other conspirator, do they not? I would agree. There we go. But then the question becomes is does the contractor here, should the contractor be the only one that's penalized? Sure, maybe somebody should go to jail. Well, there was no bribery here and so what you had was a violation of the regulation at best, but the court found nobody got paid off, let's put it that way. Nobody got paid off. Somebody at Marriott, it's pretty clear, was happy with what was going on, that is was happy with the services they were receiving, and they looked at this contractor and said, geez, you don't fit anymore within the SBA, but we're going to do it anyway. Right. And your client knew that too. Well, certainly was hopeful of that, yes. Certainly submitted a proposal that would allow them to do that, correct. And so the other point on the 227 that was brought up earlier that I wanted to address was that you had here, as you said, one act. And it's also important at various points along the line. The government suggested in its brief that it would be a Hobson's choice for the government, Marriott here, that cancel the contract and possibly suffer penalties. However, in this instance, they didn't have to cancel the contract. They knew a year before they ever exercised the first option under Mod 23 that they were going to need far more than $3 million. They could have gone out and gotten another contractor, gotten two other contractors, gotten five other contractors. They chose not to. And then even after they exceeded the $3 million, they knew that they had exceeded it and they exercised the next option and the option after that and the option after that. They didn't stop until an auditor came in. Well, they certainly didn't stop until the IG presented that report. But they certainly knew all along because then they said, well, we can't pay you the award fees, so let's renegotiate. Let's come up with a new number because we have to do that in order to pay you the award fees. I did want to reserve some of my time. Well, don't worry. We've got more questions. Oh, okay. We'll give you some more time. Okay. Well, in any event, so on the 127 invoices, the question is at what point you've got sufficient government knowledge. If you want to say Veridine committed an FCA violation in submission of the proposal, okay, fine. And then how many invoices with government having full knowledge all along the way? Well, the government didn't have full knowledge. Marriott had full knowledge. Well, Marriott is the one that got the invoices. Marriott's the one that put the money. Yeah, but if the contract was fraudulent at the outset and SBA was duped into approving the contract because of a fraudulent statement, why wouldn't all the invoices that were submitted pursuant to that contract, even though the invoices themselves didn't go to SBA, be subject to an FCA penalty? Well, except that the CFC found that the modification 23 was not fraudulently procured because the government argued that there was a common law fraud in the procurement. That's a different issue. Yeah. Obviously, the Court of Federal Claims found that mod 23 invoked the FCA penalty. Otherwise, there wouldn't have been any FCA penalties. Correct. There was a contract that was not void of amnesia. Correct. That's what she held. That's what she held. Because of lack of reliance. Pardon? Lack of reliance. Lack of reliance. Which is not a feature of the SBA penalty, right? Correct. But in this instance, at what point then does the government's knowledge of the only government agency with which we dealt under the contract, which was Marriott, once SBA signed off on modification... Well, that's the tail that's wagging this elephant. Once the SBA signs off, SBA would not have signed off if it knew what was going on. But it was not us. It was Marriott that communicated to SBA what they were going to do. But you gave Marriott the figures that they gave to SBA, knowing that they would be given to the SBA. Well, we knew that they would... Knowing that the SBA wouldn't be able to figure out what was going on. Well, the SBA certainly knew that the previous... Because the figures all look great. You add them up, and it's $3 million or under. But the original contract award, which was approved by SBA, was over $20 million for the first five years. Well, that we don't say, because they qualified for that award. Right. Well, they were still qualified at the time of this one. So from SBA's point of view, oh, well, Marriott wants to keep using this contractor who's about to go out on the program, and they've got one $3 million hit left. That's what the numbers show. And that's what Marriott told them. Yeah. And that was all copacetic. And yet Marriott... The problem was Marriott knew that wasn't the case. Now, I didn't see you arguing with regard to your penalty under the smallest claims act, where you're worrying about 127 invoices. I would have thought you might have argued that they were at least entitled to keep the first $3 million. Well, if that first $3 million would have represented... Well, they... I mean, the contract was bad because it was over $3 million. The $3 million was used up within probably a dozen invoices of the 127 because of the amount... In terms... So I can just get my head around it. There were a lot of invoices here. There's at least one to 127, and then there's 260 to 267. I don't know what's in the gap. But on this contract, how many invoices did they get paid on that the government hasn't clawed back? The government has a recovery on 127 invoices, $11,000 a pop, right? Correct. And the government wants back the Quantum Marriott money, right? Well, they want not to have to pay the Quantum Marriott money. Let's assume they don't have to pay that, and the government claims that the balance of your CDA claim is down the toilet. Correct. Okay, fine. So what are you left with at the end of performing this contract? How many invoices did you send that got paid that are unaffected by this litigation? Well, okay. There were 127 total, and it would have been... The ones that are affected by this litigation would be 260 to 267, eight invoices. Right, but what I'm trying to get at is just look to me like this is not a situation... I mean, you've made an early argument to the fact that, you know, Marriott, your client was really being... all your money was being taken away. It looked to me like there was probably quite a lot of money left on the table that your client gets to keep. Well... After Mod 23. To pay people, of course, but there wasn't... But, yeah, there wasn't... I mean, a total forfeiture would mean every single penny that the government ever gave you, you'd have to give back. Correct. How much did the government give you, and how much is left of that if you pay the penalties that are involved here? Okay, well, the payments totaled approximately $29 million. So if you took the... And then there's the $1 million in invoices that have not been paid that the court allowed under Quantum Marriott. Then there's the penalty is $1.2, $1.3 million, $127... $25 million plus. You still get to keep it. Well, no, we don't get to keep it because... How much can you earn? We had a subcontractor who got half of it. You earned it under Mod 23. Pardon? You earned it under Mod 23. We earned it under Mod 23. Pretty good shape. Well, I mean, other than to have to take, you know, pay a couple million dollars. You're not getting $25 million in profit because you've got employee expense, you've got out-of-pocket expenses, and you've got subcontractor expenses. So it's not like that he put $25 million in his pocket. But the government didn't make a 2514 forfeiture argument on invoices 1 to 27. That liability is False Claims Act liability, correct? Correct. And that's capped at $11,000 a pop. Correct. Right. So the government never came back and said, well, you were fraudulent enough, bad enough with Mod 23, that we want to forfeit everything under Mod 23. They did not, but the courts found that Mod 23 was not fraudulently induced. So the contract was not void omniscio, and therefore there would be no disgorgement. Okay. Mr. Chandler, we'll give you, I mean, Mr. Lenner, we'll give you two minutes. Mr. Chandler. Thank you, Your Honor. Your Honor, you said earlier that the numbers provided by Veridine to Marriott were given to the SBA. Did that occur before the SBA signed the contract? It did. Do you have a page number in the record that will tell us that? I'm not sure if that's in our appendix or not. I don't think we referenced that in our brief in particular. Maybe your subject could give us the number once you're finished. Okay. We happen to do that, Your Honor. And I will say, I mean, the numbers in Mod 23 itself, and Mod 23 is definitely part of our index, Mod 23 itself, those figures match up perfectly with the figures in the Mod 23 proposal that Veridine submitted. So basically, I mean, Veridine structured the extended port, or, pardon me, structured this sham contract that ultimately was executed in the form of Mod 23 by SBA. So there's clearly a direct link between. When SBA looked, assuming they looked at the numbers that were sent over, they add them up, and it comes up to $103 million, right? That's right. And the numbers they. So they say, kosher, it's okay. Exactly. And the numbers that they added up, the numbers that they had in front of them, were numbers that were generated by Veridine and provided to MERAD that MERAD then used as the basis for the Mod 23 contract. And if they had the old numbers from the contract as it existed before Mod 23, if SBA looked at that, they'd see $20 million or whatever the number was advertised, and they would look at the contract and say that was okay, right? Because the original contract was for a substantially greater number than $3 million, but it was still okay to award that to Veridine from SBA's point of view, small business. That's correct. I assume the original contract was competitively bid, right? It wasn't. They invoked an exemption. I'm not sure which exemption they invoked at the time of the initial award in 1995, but it was not subject to competition. I assume that amount of time, if I may. Well, if you have just any final thoughts. I suppose the government's position is we agree with the court that it's not necessary to consider the interaction between Veridine and MERAD, that you can look to the interaction or the way information flowed from Veridine to SBA and what Veridine's intentions were. But even if that were not the case, even if MERAD and Veridine were the only two agencies here, there's still nothing about MERAD's conduct that would render Veridine's conduct unknowing, which would need to be the case in order for Veridine to have a successful government knowledge defense under the FCA cases that it cited. Do you have a site for us there? We do. It looks like page 211 in Veridine's appendix, which is the signature page for MoD 23 itself. Okay, so this is MoD 23 itself, not the memo that went from the MERAD. Do you think the memo is not in the joint appendix? I think it may not be. Would you please send us a copy of that? I'd be happy to do that. In the next week? Certainly. Thank you. I would just make one brief comment regarding SBA, and that is that if you look at the original contract, which is in our appendix, the signature page that is showing... The original contract, you don't mean MoD 23? ...has a schedule in there which clearly shows that the contract expected at least something on the order of a million and a half, a million and seven, a million and nine, over the course of the years, that it was to be in effect. What am I supposed to conclude from that? Well, SBA certainly knew the historical dollars under the contract prior to MoD 23. They should have figured out that the three million was a sum. I'm not sure what they should have figured out. I'm just saying that SBA had historical information as well as to what the contract value had been before the extension. They're supposed to assume that their sister agency, MERAD, is incorrect, right? No, I wouldn't think that they... We know AMPRO government employees are presumed to act in good faith. That's right. Well-nigh irrefragable proof and so on. They assume that this three million bucks is going away present or going away part to VERADYME because it's going to graduate into the real world shortly. Well, they could assume that, but the representation to them was being made not by us, but by the Maritime Administration. What we did was we gave the Maritime Administration a scenario for three million dollars. Right, MERAD didn't make up the numbers. No, they didn't make up the numbers. Although they still had to give SBA a number that was under three million. Regardless of what they gave SBA was a breakdown close to our numbers, but not exact. But in any event, again, what you had was MERAD dealing with SBA, not us. Your position, Mr. Lamer, is encapsulated by that great American philosopher, Walt Kelly, in his Pogo comics. We have many enemies. I am familiar with Pogo. Thank you, Mr. Lamer. Thank you, both counsel. The case is submitted and that concludes our session for today. All rise. It's safe to say that's the first time I've heard Pogo cited here. The Honorable Court adjourns until tomorrow morning at 10 a.m.